## PERKINS BROS. CO. v. COMMISSIONER OF INTERNAL REVENUE.

### No. 10053.

Circuit Court of Appeals, Eighth Circuit.

June 6, 1935.

Arnold L. Guesmer, of Minneapolis, Minn., for petitioner.

Edward H. Horton, Sp. Asst. to the Atty. Gen. (Frank J. Wideman, Asst. Atty. Gen., and Sewall Key and S. Dee Hanson, Sp. Assts. to the Atty. Gen., on the brief), for respondent.

Before GARDNER, SANBORN, and FARIS, Circuit Judges.

GARDNER, Circuit Judge.

This is a petition for review of a decision of the Board of Tax Appeals redetermining petitioner's income tax liability for the taxable years 1928 and 1929 in the respective amounts of $2,131.16 and $1,637.51. The deficiencies arise from respondent's action in eliminating from petitioner's operating expenditures as claimed in its returns, the amounts of $20,262.07 for 1928, and $13,817.55 for 1929. Respondent determined that these amounts were not deductible as a part of petitioner's ordinary and necessary operating expenses, upon the ground that they were expended for the purpose of and resulted in increasing the circulation of its newspaper.

Petitioner is an Iowa corporation, having its principal place of business at Sioux City, Iowa, where it publishes the Sioux City Journal, a daily and Sunday newspaper. The newspaper circulates in Sioux City and territory tributary thereto. From 1887 to 1918, to increase and build up its circulation, petitioner conducted circulation building contests, and employed men to work solely in building up circulation in places where there were no or few subscribers. By these means, at a cost of $184,970.83, the circulation was increased and built up to 55,448. By dividing this cost by the total circulation gained, respondent determined a cost per unit of $3.67. He found that in 1928 the circulation increased 5,521, and multiplying this figure by $3.67, obtained a product of $20,262.07, which he subtracted from petitioner's 1928 deductions, thereby increasing the taxable income by that amount. He found that in 1929 the circulation increased 3,765, and in like manner, multiplying this figure by $3.67, increased the taxable income for that year by $13,817.55.

Upon petition for redetermination of these disputed deficiencies, the Board of Tax Appeals sustained respondent, and its decision is brought before us on this petition for review.

If the excluded amounts of expenditures were for the cost of maintaining a circulation structure, then they were deductible from income as items of ordinary and necessary expense, but if they represent the cost of building up a circulation structure, they are not deductible.

The circulation manager of petitioner was the only witness as to the nature and character of these expenditures. The facts disclosed by his testimony are substantially as follows: In 1928 and 1929, petitioner expended money for salaries to persons who handled and loaded the papers, starting them on their way to delivery, and for paper, paste, twine, truck service used to take the papers to the carrier boys' routes in Sioux City, to trains and to post offices, for postage and transportation. Salaries were paid to city carriers for delivering the papers to eight city carrier service managers, who hired, discharged, and supervised the work of the Sioux City carriers, helped to collect the subscription money from the city subscribers, checked up on what the carriers were doing, and straightened out complaints by subscribers. Salaries and travel expenses were paid to fourteen country carrier service managers and one supervisor, who hired, discharged, and supervised the work of the carriers who delivered the papers in country towns outside of Sioux City, and collected from the carriers and helped them collect from their customers, checked up on their work and straightened out complaints of subscribers, and also studied and reported on routings in the country. The country carriers received no salaries, but bought the papers at one price and delivered them to their customers at a higher price, retaining the margin as their profit.

As a part of their duties, the mail maintenance men (nineteen in 1928 and eighteen in 1929), each of whom had a certain allotted territory in petitioner's circulation area in the country, secured orders for renewals and new subscriptions. Each of these employees traveled over the territory, and in addition to securing renewals and new subscriptions, straightened out complaints, investigated and reported on more advantageous routings, procured data in answer to questionnaires submitted from time to time pertaining to the news and editorial columns, for the purpose of ascertaining what the readers wanted. They were paid a commission of 40 per cent. on all orders for renewals and new subscriptions, which covered all of their services and expenses. Salaries were paid to the circulation man-

ager and to the office force in Sioux City, consisting of persons who kept the records, attended to the billing, accounted for the circulation receipts and the clerical work of the circulation department. Petitioner's city and country carriers·were given cash and merchandise prizes for their efforts in obtaining new subscribers. In 1928 these expenditures amounted to $5,649.48, and in 1929 to $7,137.70.

There were, of course, voluntary subscriptions received, and there were losses of old subscriptions through failure to renew. There was testimony, and it is undisputed, that had it been impossible to get any additional circulation whatever, it would still have been necessary to retain all these employees and to expend all that was paid out, and that no expenditures were made for the sole purpose of obtaining subscriptions; that even after a circulation structure has been built up in a territory, it is still necessary to have a maintenance force to maintain circulation, take care of deliveries, and give service to subscribers, and counsel for petitioner offered to show that operating under the same .system, employing the same force of employees, and work-. ing in the same way as in 1928 and 1929, petitioner lost in circulation in 1930 and 1931.

With a circulation of 55,000, which was secured between 1887 and 1918, petitioner's territory was "saturated," that is, its circulation had reached a point where it was not necessary nor desirable to increase the circulation. The income arising from the publication of a newspaper is derived from two sources; namely, from its paid subscriptions, and from its advertising. The price received from subscriptions and sales of the newspaper is not sufficient to cover the cost of publication; but to attract advertising, it is essential that the publication have a certain circulation structure. When this structure has been built up to a certain point at which the paper is able to secure the maximum amount of advertising that the community served will produce, it is said to have reached the point of saturation. Circulation structure and advertising structure are interdependent, and this point of saturation is the point of balance, as it were, between circulation and advertising. To increase the circulation beyond that point would not bring new advertising, nor bring higher rates for the advertising carried; hence, there would be no increase in income from advertising; and as the

subscription price does not pay the cost of publication, any increase in the circulation beyond the saturation point, without a corresponding increase in income from advertising, means a net loss to the publisher.

It is necessary to maintain the circulation structure as near as may be at the saturation point, and petitioner contends that it was not building up nor increasing its circulation in 1928 and 1929, but was maintaining what had already been built up. The testimony is undisputed, but respondent relies upon the presumption that his determination is correct, and that the burden of proof was upon petitioner to overcome that presumption. Reinecke v. Spalding, 280 U. S. 227, 50 S. Ct. 96, 74 L. Ed. 385; Botany Worsted Mills v. United States, 278 U. S. 282, 49 S. Ct. 129, 73 L. Ed. 379. The applicable statute is the Revenue Act of 1928, c. 852, 45 Stat. 791, § 23 (a), 26 USCA § 2023 (a), which provides that in computing net income there shall be allowed as a deduction "all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including a reasonable allowance for salaries or other compensation for personal services actually rendered."

We have held that the circulation of a newspaper is an intangible capital asset, and that money expended in increasing it is a capital expenditure, and not deductible as an expense of carrying on the business [Meredith Pub. Co. v. Commissioner, 64 F. (2d) 890, 891; Public Opinion Pub. Co. v. Jensen, 76 F.(2d) 494, 496]; but where the expenditure is for the purpose of maintaining a circulation structure, then it is deductible as an ordinary and necessary expense, and these cases are clearly·distinguishable · from the instant case. The expenditures considered in the above-cited cases were for campaigns, drives, or contests carried on for the express purpose of increasing the circulation list, and as a result of which the circulation was tremendously increased. Here, it appears without dispute, that petitioner did not do this in 1928 and 1929, but carried on only the normal business of soliciting subscriptions for the purpose of keeping up the circulation structure which it had already built up and established to the normal or saturation point. The incidental fact that the number of subscribers was increased does not bring petitioner within the rule of the Meredith or the Public Opinion Cases. Operating under the· same system, employing the same force of

employees, and working in the same way, it lost in circulation in 1930 and 1931. We must bear in mind that we are here considering the character of an expenditure, and that is dependent upon its general purpose rather than upon an incidental result.

In Meredith Publishing Co. v. Commissioner, supra, we considered the petition of a taxpayer seeking to review a determination of the commissioner, arising from the disallowance of deduction of sums expended for the purpose of gaining new subscribers. The facts as stated in the opinion of the Board of Tax Appeals (23 B. T. A. 150), disclosed that the money so expended was used in a vigorous campaign for the express purpose of building circulation, and that the circulation was largely increased. In affirming the decision of the Board, we said inter alia:

"That the circulation of a magazine or newspaper is an intangible capital asset does not admit of doubt. The Commissioner of Internal Revenue has consistently so held from his first consideration of the question, and his holding has been upheld and approved by the courts. Danville Press, Inc., 1 B. T. A. 1171; Gardner Printing Co., 4 B. T. A. 37; Herald-Despatch Co., 4 B. T. A. 1096; Walter S. Dickey, 14 B. T. A. 1295; Tulsa Tribune Co., 21 B. T. A. 1405; Public Opinion Publishing Co., 6 B. T. A. 1255; Commercial Natl. Ins. Co., 12 B. T. A. 655, 657; News Publishing Co. v. Blair, 58 App. D. C. 295, 29 F.(2d) 955; Strong Publishing Co. v. Commissioner (C. C. A. 7) 56 F.(2d) 550.

"And it must follow that money expended in building up this circulation structure is a capital expenditure, and not the ordinary and necessary expense incurred in carrying on a trade or business, under the provisions of section 234 (a) (1) of the Revenue Act of 1921 (42 Stat. 254). Such expenditure under said section 234 to be deductible must be in the nature of upkeep —not of investment (Duffy v. Central R. R. Co. of New Jersey, 268 U. S. 55, 63, 45 S. Ct. 429, 69 L. Ed. 846); and must be both ordinary and necessary in the conduct of a business or trade (Robinson v. Commissioner (C. C. A. 8) 53 F.(2d) 810, 79 A. L. R. 975; Lloyd v. Commissioner (C. C. A. 7) 55 F.(2d) 842, 843."

In Public Opinion Publishing Co. v. Jensen, supra, as the result of subscription contests for the specific purpose of building up the circulation structure, the taxpayer increased its structure by approximately 40 per cent. The lower court found that the expenditures were made for the sole purpose of increasing circulation and resulted in increased earning power, and hence, were capital expenditures, and we held there was substantial evidence to support such findings and affirmed the judgment, saying: "The circulation of a publication is a capital asset, and money expended in increasing it is a 'capital expenditure' and is not deductible in determining the publisher's taxable income."

Here, however, the expense was both ordinary and necessary in the conduct of petitioner's business, and it was in the nature of upkeep or maintenance.

In Appeal of Gardner Printing Co., 4 B. T. A. 37, the Board of Tax Appeals, in determining the value of a publication called the "Pattern Maker," among other things said: "We are not impressed with the taxpayer's argument that the value of a publication should be taken to be the amount which has actually been expended in developing it. A newspaper circulation structure is an asset which must be continually supported by such advertising and soliciting as will result in constantly bringing in new subscribers and new advertising patrons to take the place of those who, in the regular course of business, are constantly dropping off."

The distinction is noted in Meredith Publishing Co. v. Commissioner, supra, where Judge Van Valkenburgh, speaking for the court, said: "In the case at bar the Board stated the practice thus: 'Circulation structure is an asset which must be continually supported by bringing in new subscriptions to replace those which are continually expiring. Gardner Printing Company Case, supra. The cost of so supporting the circulation structure is an ordinary and necessary business expense but the cost of building up or establishing a circulation structure must be charged to capital.'"

In supporting the circulation structure, it was necessary to secure new subscriptions to take the place of discontinued ones, and in doing so it is to be expected that fluctuations will from time to time occur, and, as has already been noted, counsel for petitioner offered to prove that there was in fact a decrease in the circulation during the years 1930 and 1931, during which the same methods were employed for the avowed purpose of supporting the circulation. The mere fact that there was an increase

in 1928 and 1929 does not change the character of the expenditure. That, as already said, is dependent upon its general purpose, rather than an incidental result.

The ·fact that certain of the employees of petitioner were paid on a commission basis is not, we think, important as they performed many duties other than the taking of subscriptions, and it is improbable that these employees secured any substantial portion of the increase, as the carriers, as well as the city and country service managers, all of whom were paid salaries, all secured renewal and new subscriptions.

We conclude that the expenditures were in the nature of ordinary and necessary expenses incurred for the purpose of maintaining petitioner's circulation structure, and that the finding of the Commissioner and of the Board of Tax Appeals to the contrary is not sustained by any substantial evidence.

Petitioner assigns other errors, principally in the method used to determine the deficiency, and in rulings on the admissibility of evidence, but in view of the conclusion reached, it seems quite unnecessary to consider these questions.

The decision of the Board of Tax Appeals is reversed, with directions to allow petitioner's said expenditures as ordinary and necessary operating expenses.